**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| SAUNDRA J. COUNCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:06cv00171 |
| v. | ) | JUDGE HAYNES |
| | ) | |
| R. JAMES NICHOLSON, Secretary, | ) | |
| United States Department | ) | |
| of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M

Plaintiff, Saundra Counce, filed this pro se action under the Civil Rights Act of 1871, 42

U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1),

("Title VII") and the Privacy Act of 1972, 5 U.S.C. § 552a(b), against Defendant, R. James

Nicholson, Secretary of the United States Department of Veteran's Affairs ("VA").   Plaintiff, a

former VA employee, asserts claims that the Defendant discriminated against her based on race,

sex, age and subjected her to a  hostile work environment as well as retaliating against Plaintiff

after she complained of disparate treatment.  Plaintiff also asserts claims for violations of her

privacy rights.

Plaintiff's specific allegations are that: (1) her employer delayed her permanent employee

status based upon her race, sex and age; (2) despite Plaintiff's complaints that her supervisors

bullied her and other employees, such bullying continued and escalated; (3) after Plaintiff

complained, she was terminated; (4) Plaintiff's supervisor entered into an oral contract with

Plaintiff; but did not honor the contract; (5) Plaintiff's confidential email and personnel file were

improperly disclosed; (6) Plaintiff's supervisor enlisted employees to "write-up" Plaintiff in a

negative light; (7) Plaintiff's written account of events was withheld from the Nurse Professional Standards Board hearing; (8) Plaintiff's supervisor forged and backdated a second annual proficiency report about Plaintiff four days before that hearing; (9) the Nurse Professional Standards Board prevented Plaintiff's union steward from testifying on Plaintiff's behalf; (10) Plaintiff was denied favorable testimony when Plaintiff's supervisor did not provide an employee with adequate notice of Plaintiff's hearing; (11) Plaintiff was denied her request for records for her hearing before the Nurse Professional Standards Board; and (12) during her employment, Plaintiff was wrongfully denied merit raises. The Defendant filed an answer denying Plaintiff's allegations and the parties proceeded with discovery.

Before the Court is Defendant's motion for summary judgment, (Docket Entry No. 14), contending in sum: (1) that the Court lacks jurisdiction to hear this controversy under Fed. R. Civ. P. 12(b)(1); (2) that Plaintiff has failed to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6); (3) that Plaintiff failed to exhaust timely her administrative remedies; (4) that Title VII is the exclusive and preemptive remedy for discrimination based on race and sex in federal employment; (5) that Plaintiff's privacy claims are untimely and fail to state a claim; (6) that Plaintiff cannot establish a prima facie case of race, sex, age discrimination, or retaliation; and (7) that even if such showings were made, Defendant had legitimate, nondiscriminatory reasons for its decisions.

In response, (Docket Entry No. 21-1), Plaintiff asserts: (1) that she timely exhausted her administrative remedies; (2) that the Administrative Law Judge ("ALJ") should not have issued a right to sue letter if Title VII provides the exclusive and preemptive remedy for discrimination based on race and sex in federal employment; (4) that her proof shows violations of the Privacy

2

Act; (5) that her proof establishes a prima facie showing of race, sex and age discrimination as well as retaliation; and (6) that Defendant's stated reasons for its actions are pretextual for discrimination and retaliation.

Of the parties' contentions, the Court addresses first, the exhaustion issue that may limit the Court's consideration of the remaining issues.

## A. The Exhaustion of Administrative Remedies

### 1. Review of the Record

Counce first initiated contact with an EEO counselor on September 12, 2003, when she filed a VA Form 4939 complaint of discrimination with the VA. (Docket Entry No. 2-2, Complaint of Discrimination at Plaintiff's Exhibit p. 28). In this complaint, Counce alleged that the VA hospital staff managers discriminated against her based on her Hispanic race, her sex and age in the following ways: (1) an admonishment of Plaintiff on April 4, 2003; (2) assignment of duties on June 7, 2003; (3) a demotion on October 1, 2001; (4) assignment of duty hours on July 24, 2003; (5) harassment since September 29, 2003; (6) an invalid performance appraisal/proficiency report on August 17, 2003; (7) her termination; (8) her time and attendance on July 24, 2003; (9) her training on July 24, 2003; and (10) her working conditions on June 7, 2003. Id.

This VA Form 4939 instructs the employee: "if you contacted an EEO Counselor more than 30 calendar days after the date(s) above, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Final Interview, you must explain why you were untimely." Id. On this form, Counce admits that she had not contacted an EEO counselor or filed a union grievance. Id.

3

In a letter dated September 19, 2003, the VA informed Nelda Rouse, Counce's union steward, that Counce would be separated from her employment as a staff nurse. (Docket Entry No. 15-11, Separation Letter at p. 2). The letter further stated that Counce would remain on active duty status pending the effective date of her separation on October 3, 2003. Id. According to the letter, appointments under 38 U.S.C. § 7401(1) carry a two year probationary term. Id. "The probationary period is an extension of the appointment process during which the supervisor observes the employee's conduct and performance on the job. If concerns are raised to indicate an employee has not demonstrated fitness or qualifications for continued employment, a Summary Review Board may be convened to review the employee's services." Id. at p. 1. The September 19th letter states that VA terminated Counce's employment based on the findings from the NPSB hearing. Id. at p. 2.

A letter dated October 15, 2003 informed Counce that the EEO counselor was closing her informal counseling. (Docket Entry No. 15-12, Counseling Letter). This letter provided notice of Counce's right to file a formal discrimination complaint within 15 days of her receipt of the letter. Id. Counce signed for and received this notice on October 27, 2003. (Docket Entry No. 15-15, Letter from Regional EEO Officer at p. 1). Counce filed a formal complaint of employment discrimination on November 10, 2003, alleging discrimination based on race, sex and age and reprisal. (Docket Entry No. 15-13, Complaint of Discrimination).

In a letter dated April 27, 2004, VA's Office of Resolution Management sent Counce a corrected Notice of Receipt of Discrimination Complaint, acknowledging her November 10, 2003 complaint. (Docket Entry No. 15-14, Corrected Notice of Receipt at p. 1). After a review of the file, the VA's EEO officer catalogued Counce's factual allegations in her formal complaint

4

of discrimination:

> [Y]ou were hired on a Temporary Excepted Appointment on June 17, 2001, as a Staff Nurse. On April 21, 2002, your temporary appointment was converted to an Excepted Appointment, which began a two-year [probationary period]. [On June 17, 2002, you requested a] raise, which was denied. On September 22, 2002, the NPSB denied your request for a merit raise. As of September 29, 2002, you were not allowed to orientate new employees which limited your ability to perform up to your performance evaluation system, and on that same date, a co-worker LPN warned new employees to avoid you because you are trouble. You stated you went to your Nurse Manager, Linda Wyatt, many times complaining of the LPNs threatening behavior toward yourself and other staff members. On November 29, 2002, Ms. Wyatt berated the staff with an offer to transfer anyone who was disgruntled. On December 9, 2002, you requested an audit of your timecards due to a Charge Nurse allegedly tampering with it. The request was denied. On April 15, 2003, you received a written warning because Ms. Wyatt viewed your passing out information about bullying to staff mailboxes as insubordination. You wrote that on June 7, 2003, you were assigned eight patients, which increased your workload disproportionately. On June 20-21, 2002, Ms. Wyatt left your personnel folder in a prominent place in the nurse's station for anyone to see. You filed a union grievance on this matter but the grievance was never responded to. On July 24, 2003, AWOL was written on your timecard and you were shorted eight hours in your paycheck. Also on July 24, 2003, you submitted a request for education but your request was denied. On August 1, 2003, you learned that you were being accused of falsification of medical records for documenting that you had administered medication when you had not. On August 17, 2003, you received, what you consider to be, a bad performance evaluation. On September 4, 2003, you received notification that you would be separated from your probationary position effective October 3, 2003. On October 31, 2003, you learned that you were shorted approximately $2000 on your last paycheck due to being charged an addition 24 hours of AWOL, you were not given credit for 8 hours of earned annual leave, and your comp time was improperly calculated.
>
> Based on a thorough review of the complaint file, we conclude that the claims in your Race, Sex, Age, and Reprisal based complaint of discrimination are Harassment, Time and Attendance, Promotion, Assignment of Duties, Written Warning, Training, Performance Evaluation and Termination.

(Docket Entry No. 15-15 at pp. 2-3) (emphasis omitted).

The EEO Counselor then categorized Counce's factual allegations into distinct claims as follows:

5

A.  September 28, 2001– An Employee Assistance worker revealed your conversation with her to your nurse manager. [Harassment]

B.  June 17, 2002– Your request for an annual raise was denied. [Promotion]

C.  September 22, 2002– Nurse Professional Standards Board (NPSB) denied your request for a merit raised and wrongfully evaluated you. [Promotion]

D.  September 29, 2002– You have not been allowed to orientate new employees, thus limiting your ability to perform up to your Performance Evaluation System. [Assignment of Duties]

E.  September 29, 2002– A Licensed Practical Nurse (LPN) co-worker warned new orientates to avoid you because you are nothing but trouble. [Harassment]

F.  November 14, 2002– The Nurse Manager berated staff with offers to transfer anyone who was disgruntled. [Harassment]

G.  December 9, 2002– A request for an audit of your timecards was denied. [Time and Attendance]

H.  April 15, 2003– You received a written warning by your Nurse Manager for insubordination. [Written Warning]

I.  June 7, 2003– You were assigned eight patients, increasing your load disproportionately. [Assignment of Duties]

J.  June 9, 2003– Nurse Manager called in a LPN on her day off to write up a patient incident to make you look bad. [Harassment]

K.  June 20-21, 2003– Your Nurse Manager left your Personnel File in a prominent place in the Nurse's Station, for all to see. [Harassment]

L.  July 24, 2003– AWOL was written on your timecard and you were shorted eight hours that pay period. [Time and Attendance

M.  July 24, 2003– You were denied education. [Training]

N.  August 1, 2003– You were charged with falsification of medical records. [Harassment]

O.  August 17, 2003– You received a bad evaluation.

6

P.      October 3, 2003– You were terminated from your probationary position.

Q.      October 31, 2003– You were shorted approximately $2000 in severance pay.

R.      October 31, 2003– You learned that you were charged with an additional 24 hours of AWOL.

(Docket Entry No. 15-15 at pp. 1-2, 11).

The EEO Officer then dismissed claims A, B, C, D, E, G, H, I, L, and M due to untimeliness under 29 C.F.R. § 1614.105(a)(1) that requires a complaint of discrimination to be brought to the attention of an EEO counselor within 45 days of the alleged discriminatory act. Id. The letter further states that claims identified as F, J, K, N, O, P, Q and R would be accepted for investigation. Id. at p. 6. The Plaintiff filed this action on February 23, 2006. (Docket Entry No. 1).

Counce contends that she was operating under the misapprehension that the issues had been resolved at the "very lowest possible level" until August 17, 2003 when she received her second annual proficiency report. (Docket Entry No. 21-1, Plaintiff's Response to Defendant's Motion for Summary Judgment at p. 2). In addition, Counce asserts that "there is no indication that the [VA] ever educated Plaintiff on examples and EEO timelines it wished to be used." Id. Counce cites email correspondences between Angela V. Tomlinson and Rose Marie Eiza, from the Office of Resolution Management (ORM):

> [From Eiza to Tomlinson]
> However, the record doesn't show that Ms. Counce had EEO training indicating times lines for filing an EEO complaint. The record you sent only shows she had Sexual Harassment refresher training. It's not the same and won't do for purposes of informing employees of the EEO process and time limits. Is the EEO process covered in new employee orientation? If so, (1) did Ms. Counce attend the training and (2) what exactly is covered?...

7

[Response from Tomlinson to Eiza]
All of the discrimination process is covered in New Employee training as far as diversity, how to file a discrimination complaint, Sexual Harassment. This training is conducted the second day of orientation.

(Docket Entry No. 21-2). (emphasis added).

Counce received training on the EEO process during orientation. According to the Regional EEO counselor, Counce was "aware of required time frames for filing a complaint as evidenced by [her] training record indicating [she] had Prevention of Sexual Harassment Refresher Course in January 2003." (Docket Entry No. 15-15 at p. 5). The Sexual Harassment Refresher Course also included the time frames for filing complaints. Id.

### 2. Conclusions of Law

Federal employees with discrimination claims based upon race, sex and/or age must exhaust available administrative remedies before filing a legal action. "In permitting federal employees to sue under Title VII, Congress conditioned the government's waiver of sovereign immunity upon a plaintiff's satisfaction of 'rigorous administrative exhaustion requirements and time limitations.'" McFarland v. Henderson, 307 F.3d 402, 406 (6th Cir.2002) (citing Brown v. General Servs. Admin., 425 U.S. 820, 833 (1976)). Federal regulations require initiating contact with an EEO Counselor within 45 days of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1). "Timely contact with an EEO counselor is an administrative remedy that a federal employee must invoke before he may bring a claim of employment discrimination in federal district court." Horton v. Potter, 369 F.3d 906, 910 (6th Cir.2004) (citing Benford v. Frank, 943 F.2d. 609, 612 (6th Cir.1991)). If the federal employee fails to comply with the 45 day time limitation, the agency must dismiss the entire complaint pursuant to 29 C.F.R. §

8

1614.107(a)(2) (2003). Horton, 369 F.3d at 910.

To be actionable, a discrete act of discrimination must occur within the 45 days immediately preceding a plaintiff's initial contact with the EEO Counselor.

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.
>
> * * *
>
> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [A plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 114 (2002). Discrete acts are singular acts that may not be actionable on their own. McFarland, 307 F.3d at 408. Discrete acts are defined as actions with a definite degree of permanence. (Docket Entry No. 15-15 at p. 4).

The Court concludes that all of Counce's claims occurring prior to August 1, 2003 are discrete claims. The Court finds these claims involve discrete acts that are singular in nature and of finite duration. Thus, the Court concludes that these claims are untimely because they occurred more than 45 days before Counce first met with the EEO counselor. The relevant question becomes whether the untimely filed claims can be saved.

There are instances that may extend the 45 day time limit for EEO contact. Specifically, time limit will be extended if the individual can show that:

> he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or Commission.

9

29 C.F.R. § 1614.105(a)(2). In a word, "[b]ecause exhaustion requirements pursuant to Title VII are not jurisdictional prerequisites, they are subject to waiver, estoppel, and equitable tolling." McFarland, 307 F.3d at 406 (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)). Although available, equitable tolling is to be granted sparingly. Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 560 (6th Cir.2000) (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). Indeed:

> Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control. See Baldwin County, 466 U.S. at 151, 104 S.Ct. 1723 ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."); see also Johnson v. United States Postal Service, 64 F.3d 233, 238 (6th Cir.1995), which directed that a petitioner's failure to satisfy a deadline caused by "garden variety neglect" cannot be excused by equitable tolling. (Citing Irwin, 498 U.S. at 96, 111 S.Ct. 453). Absent compelling equitable considerations, a court should not extend limitations by even a single day. Johnson v. United States Postal Service, 863 F.2d 48 (Table), 1988 WL 122962, at *3 (6th Cir. Nov.16, 1988).

Id. at 560-61.

The Sixth Circuit listed five factors on whether equitable tolling is appropriate: (1) whether the plaintiff had actual notice of the time restraint; (2) whether she had constructive notice of the time restraint; (3) the degree of diligence exerted in pursuing her rights; (4) the degree of prejudice to the defendant; and (5) the reasonableness of plaintiff's ignorance of the time constraint. Steiner v. Henderson, 354 F.3d 432, 435 (6th Cir.2003) (citing EEOC v. Ky. State Police Dep't, 80 F.3d 1086, 1094 (6th Cir.1996). This list is not exhaustive and equitable tolling must be determined on a case-by-case basis. Graham-Humphreys, 209 F.3d at 561 (citing Truitt v. County of Wayne, 148 F.3d 644, 648 (6th Cir.1998)).

10

For her tolling argument, Counce contends that she did exhaust her administrative remedies because she sought to resolve her complaints of discrimination at the "very lowest possible level" and that VA did not educate her on EEOC timelines for filing complaints. (Docket Entry No. 21-1, Plaintiff's Response to Defendant's Motion for Summary Judgment at p. 2). Yet, Counce's proof reflects that in fact, she had notice of the time-lines for filing an EEO complaint. The email correspondence between Tomlinson and Eiza, reflects that Counce was knowledgeable about the EEO process during her initial training at the VA and was reminded of the EEO time frame for filing complaints during a training session in January 2003.

The Court concludes, however, Plaintiff's claim that she was charged with AWOL on July 24, 2003 is subject to equitable tolling, because Plaintiff did not know of the AWOL charge until August 1, 2003, that is within the requisite time period. (Docket Entry No. 21-2, Counce Affidavit at ¶ 66). Thus, Plaintiff's claims A-K and M are dismissed for Counce's failure to exhaust her administrative remedies as to those claims.

## B. Defendant's Motion for Summary Judgment

### 1. Review of the Record[1]

Counce, who is Hispanic, was born on October 17, 1949 and has been a registered nurse ("R.N.") since 1972, specializing in Intensive Telemetry Step-down Critical Care, Intensive

---

[1]    Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Because there are material factual disputes, this section does not constitute findings of fact under Fed. R. Civ. P. 56(d).

Thoracic Care, Emergency Room Nurse Management and Mobile Coronary Care. (Docket Entry No. 21-2, Counce Affidavit at ¶¶ 3, 8 and Docket Entry No. 15-4, Personnel Action 6/17/2001). Counce began her employment with the VA on June 17, 2001 as a Staff Nurse assigned to "2 North," the facility's Telemetry Step-down Intensive Care Unit. (Docket Entry No. 21-2, Counce Affidavit at ¶ 2). Plaintiff was a temporary employee until the VA awarded her permanent status on April 21, 2002. (Docket Entry No. 15-4. Personnel Action 6/17/2001 and Docket Entry No. 15-5, Personnel Action 4/21/2002 ). During Counce's employment with the VA, she was a member of the AFGE Union Local 2400 ("Union") for which Nelda D. Rouse, R.N., was the Union Steward. (Docket Entry No. 21-2, Counce Affidavit at ¶¶ 4-5).

According to Counce, one of her colleagues, Deborah Steeves, a licensed practical nurse ("L.P.N."), created workplace tension because she was frequently mean and disrespectful to co-workers, including Counce. (Docket Entry No. 2-4, Email from Counce to Wyatt at Plaintiff's Exhibit p. 68-e). Counce also asserts a general atmosphere of bullying was common at 2 North. Counce recites several instances of perceived bullying in a series of emails written to Linda Wyatt, R.N., Nurse Manager. (See Docket Entry No. 21-2, Emails Counce Affidavit at pp. 7-23). To improve the working conditions at 2 North, Counce attempted to make a presentation about the dangers of bullying, but such presentation never occurred. (Docket Entry No. 2-4, Emails re: Bullying at Plaintiff's Exhibit pp. 72-3).

Much of the issues between Counce and the VA originate from events occurring on June 7, 2003, when 2 North, her ward, did not have enough nurses to cover the number of patients

Case 3:06-cv-00171   Document 27   Filed 04/18/07   Page 12 of 33 PageID #: 804

requiring care. (Docket Entry No. 2-4, Affidavit of Evelyn C. Smith, L.P.N.[2] at Plaintiff's Exhibit p. 67b at ¶ 8). Due to understaffing, Counce had to provide care for eight patients. Id. at ¶ 9. According to Counce, when she visited one of her patients to administer his morning medications, she noticed that he soiled himself. Id. at ¶ 10. After removing the soiled garments and linens, Counce realized that fresh supplies were not in the patient's room. Id. Counce covered the patient with a clean top sheet while she left the room to obtain the requisite supplies. Id. Before completing her task, Counce was paged to another patient's room for an emergency situation. Id. At some point after 11:00 a. m., once the critical patient had stabilized, Counce returned to the original patient to finish his linen and gown change and to administer his medications. Id. at ¶¶ 10-11.

Before Counce returned to the patient's room to finish the linen change or administer medication, the patient's daughter arrived at the VA and stated that she found her father had kicked off his covers and was left lying naked in his bed, unattended. Id. Upset with Counce's care, the patient's daughter raised her voice to Counce, accusing her of poor care and giving her father's medications late. Id. Counce tried to explain that she was late because she responded to an emergency situation, but the patient's daughter grabbed the pills from Counce, stating that she would administer the medication to her father. Id.

Steeves and Evelyn Smith, L.P.N. were present during this confrontation and volunteered to take over the patient's care. Id. at ¶ 12. The patient's daughter, still upset with Counce's care, followed Steeves's advice and reported her complaints directly to Dr. Harris, Associate Director

---

[2] Evelyn Smith is a Licensed Practical Nurse who worked the same shift as Counce on June 7, 2003.

13

of Patient Care Services. According to Smith, Steeves's advice that the patient's daughter complain to Dr. Harris "completely ignored, and was contrary to, the established hospital procedure for dealing with a dissatisfied family member." Id. at ¶ 15.

Wyatt, the nurse manager directed Steeves to write a report about the incident. Id. at ¶ 17. On June 11, 2003, Wyatt telephoned Counce at home to get Counce's account of the events of June 7, 2003. (Docket Entry No. 15-6, Wyatt Memorandum at p. 6). Wyatt then wrote her report on that conversation. Id. Wyatt also completed a report of her conversations with the patient's daughter about the incident. (Docket Entry No. 15-6, Wyatt Memorandum at p. 5).

On Counce's one year anniversary of her employment, Wyatt completed Counce's yearly proficiency report. (Docket Entry No. 2-3, 2002 Proficiency Report at Plaintiff's Exhibit p. 55). Wyatt's comments were positive in all areas and Wyatt rated Counce "satisfactory" in her overall performance as well as in "nursing practice" and "interpersonal relationships." Id. at p. 56.

Wyatt evaluated Counce in 2003, the following year, but some discrepancy exists about the intended content of that report. (Docket Entry No. 2-3, 2003 Proficiency Report at Plaintiff's Exhibit pp.57-58 contra Docket Entry No. 2-3, 2003 Proficiency Report at Plaintiff's Exhibit pp.60-61). According to Counce, Wyatt's 2003 proficiency report was favorable and "satisfactory" but another 2003 proficiency report reflects that Wyatt rated Counce at "low satisfactory" for her performance that year. Id. The favorable 2003 proficiency report that is dated May 20, 2003, is not signed by Wyatt, who is listed as the "rating official," nor by Scott Erwin, R.N., PhD, the other person listed as the "approving official". (Docket Entry No. 2-3, 2003 Proficiency Report at Plaintiff's Exhibit p. 58). The unfavorable 2003 proficiency report that is dated June 20, 2003 has Wyatt's and Erwin's signatures. (Docket Entry No. 2-3, 2003

14

Proficiency Report at Plaintiff's Exhibit p.61).

It should be noted that an additional copy of the unfavorable 2003 proficiency report exists that Wyatt signed on June 20, 2003 and Erwin on August 21, 2003. (Docket Entry No. 2-3, 2003 Proficiency Report at Plaintiff's Exhibit p. 63). Counce, however, refused to sign the report when presented to her on August 21, 2003. Id. The unfavorable report makes numerous references to the June 7, 2003 incident and Counce's complaints and attempts to educate her colleagues on bullying. (Docket Entry No. 2-3, 2003 Proficiency Report at Plaintiff's Exhibit p. 63).

On July 7, 2003, Wyatt recommended Counce's termination. (Docket Entry No. 15-6, Wyatt Memorandum at p.1). Wyatt based her recommendation her contact report and other documents, including contact reports by Steeves and Morris on the June 7th incident. Id. Wyatt opined that Counce displayed a lack of professionalism and compassion on June 6-7, and her behavior reflected poorly on the VA and her fellow co-workers. Id. Erwin and Harris concurred with Wyatt's conclusions. Id.

On August 1, 2003 Plaintiff received notice that her job performance and conduct were to be reviewed before the Nurse Professional Standards Board ("NPSB") on August 21, 2003, based upon "falsification of medical records related to medication administration, insubordination (failure to report to duty, not training, as directed by the Nurse Manager), and failure to follow acceptable nursing standards of care and practice related to patient care." (Docket Entry No. 22, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 5 and Docket Entry No. 15-7, Memorandum from Chairperson of NPSB at p. 1). According to Counce, despite several requests, she did not receive documentation on the allegations of wrongdoing until August 8,

15

2003.  (Docket Entry No. 2-3, Plaintiff's Charted Claims at pp. 14-16).

Counce requested that Smith testify before the NPSB regarding the events of June 7, 2003.  (Docket Entry No. 2-4, Smith Affidavit at ¶ 24).  Smith, however, was not notified of the hearing until August 21, 2003 when Wyatt telephoned her at home, three hours before the hearing was to begin.  Id.  Wyatt informed Smith that she had placed a "Notice to Appear" in Smith's mailbox the previous day.  Id.  Smith could not attend the hearing on such short notice.  Id.  On August 22, 2003, Smith checked her mailbox and did not find the "Notice to Appear."  Id.

After her August 21, 2003 hearing, Counce told Smith that the Board would re-convene the following Thursday, so it could hear Smith's testimony.  Id. at ¶ 25.  Upon mentioning the supplemental hearing to Wyatt, Wyatt informed Smith that: "[i]t's not necessary, the Board already made a decision."  Id.  Smith insists that her testimony, if heard, would have been favorable to Counce.  Id.

On September 9, 2003, the NPSB reached a decision on Counce and found that: "Ms. Counce did falsify medical records related to medication administration, was insubordinate in reporting to duty as directed by her supervisor and did fail to follow acceptable nursing standards of care and practice related to patient care."  (Docket Entry No. 15-9, Board Action, at p. 2).  As a result of its findings, the NPSB recommended Counce's termination.  Id.

### B.  CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover,

16

"district courts are widely acknowledged to possess the power to enter summary judgment <u>sua</u> <u>sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u>, <u>Routman v. Automatic</u> <u>Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only</u> <u>disputes over facts that might affect the outcome of the suit under the governing</u> <u>law will properly preclude the entry of summary judgment</u>. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v.</u>

McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989).  But see Routman v. Automatic Data

Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e
> find no express or implied requirement in Rule 56 that the moving party support
> its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying

Rule 56(c) standards."  Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986).  The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of

material fact.  Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting

Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)).  "So long as the movant

has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the

nonmoving party then `must set forth specific facts showing that there is a genuine issue for

trial.'"  Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule

56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he

respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must

`present affirmative evidence in order to defeat a properly supported motion for summary

judgment.'"  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty

18

<u>Lobby</u>).  Moreover, the Court of Appeals explained that:

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

<u>Street</u>, 886 F.2d at 1480 (cites omitted).  See also <u>Hutt v. Gibson Fiber Glass Products</u>, No.

89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment

must determine `whether the evidence presents a sufficient disagreement to require a submission

to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting

<u>Liberty Lobby</u>)).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

> \* \* \*

> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>.  If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>.'

19

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." <u>Webster's Third New InterNational Dictionary</u> (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

<u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of

20

undisputed and disputed facts.

In <u>Street</u>, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.  Complex cases are not necessarily inappropriate for summary judgment.

2.  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.  The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.  A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.  As on federal directed verdict motions, the `scintilla rule' applies, <u>i.e.</u>, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.  The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.  The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.  The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there

21

is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

The Court must be careful when analyzing the contentions of a pro se litigant. "While a court must construe a pro se plaintiff's pleadings more liberally than pleadings prepared by an attorney, pro se litigants 'are not exempted or excused from the Federal Rules governing pleading, dismissal for failure to state claims, and summary judgment.'" Moore v. Holbrook, 2 F.3d 697, 705 (6th Cir.1993). See also McKinnie v. Roadway Express, Inc., 341 F.3d 554, 558 (6th Cir.2003) ("Ordinary civil litigants proceeding pro se, however, are not entitled to special treatment, including assistance in regards to responding to [dispositive] motions.").

The Court's analysis of Counce's timely claims involves the following claims: (1) that she received an AWOL for July 24, 2003; (2) that she was charged with falsification of medical records; (3) that she was terminated from employment during her probationary position; (4) that she received

22

a bad evaluation; (5) that she was shorted approximately $2,000 in severance pay[3], and that (6) she was charged with an additional 24 hours of AWOL.

## Section 1983 Claims

In Brown v. General Services Administration, 425 U.S. 820 (1976), the Supreme Court ruled that "§ 717 of the Civil Rights Act of 1964, as amended, [42 U.S.C. § 2000e-16] provides the exclusive judicial remedy for claims of discrimination in federal employment." Brown, 425 U.S. at 835. Thus this Court will dismiss Plaintiff's claims under 42 U.S.C. § 1983.

## Privacy Act Claims[4]

Under 5 U.S.C. § 552a(b), "no agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains..."

Counce argues that VA violated rights when on July 18, 2003, Wyatt left her personnel file in the open and anyone could have viewed its contents. In addition, Counce asserts that Dee Wheeler, of the Employee Assistance Program ("EAP") sent a confidential email to Dr. Harris and that Dr. Harris forwarded the email to Wyatt. Specifically, Counce claims that VA violated 5 U.S.C.

---

[3] Plaintiff admits to receiving a lump sum from the VA after filing her complaint, though she complains that there was no accounting for accuracy regarding the appropriateness of the amount. (Docket Entry No. 22, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 16).According to Lee Danielson, a labor relation specialist with the VA, "Ms. Counce was not shorted $2,000.00 in final pay and was paid based upon time worked, approved leave, and accumulated annual leave." (Docket Entry No. 17 at ¶ 10).

[4] In her complaint, Counce cites two incidents to be violations of the Privacy Act. Thus, the Court will discuss them under that statute, despite that the EEO officer categorized these incidents as harassment and the Court found them untimely under Title VII.

23

§§ 552a. (Docket Entry No. 2-1 at ¶¶ 15, 19).

Under 5 U.S.C. § 552a(g)(5), "an action to enforce liability created under this section may be brought in the district court of the United States... within two years from the date on which the cause of action arises..." While Counce first complained of Privacy Act violations to an EEO counselor on November 10, 2003, she did not present her complaint to a United States District Court until February 23, 2006. Thus, her claim for a violation occurring on July 28, 2003 is untimely.

Counce's alleged confidential email sought advice from Wheeler regarding how to proceed with a proposed power point presentation on bullying. (Docket Entry No. 26, Exhibit G, Email from Counce to Wheeler). This email was also sent to Rouse. 5 U.S.C. § 552a(4) defines record as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history..." The email correspondences between Counce and Wheeler did not contain this type of sensitive information. The Court concludes that because the email contained information regarding a potential presentation on bullying that Counce's supervisors directed her to submit for their review, was not confidential and the forwarding of the email did not constitute a violation of the Privacy Act.

### Race and/or Sex Discrimination

Title VII makes it unlawful for the federal government to discriminate against its employees based on race or sex. 42 U.S.C. § 2000e-16 (a). Counce claims are that during her employment, the VA discriminated against her because of her Hispanic race and her sex.

To establish a prima facie case of discrimination a Counce must demonstrate: (1) that she belongs to a protected class (here, that she is Hispanic and female); (2) that she suffered an

24

adverse employment action; (3) that she was qualified for the position; and (4) that she was treated differently from similarly situated persons outside the protected class. <u>Alexander v. Local 496, Laborers' Intern. Union of North America</u>, 177 F.3d 394, 402-03 (6th Cir.1999) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)). In its motion for summary judgment, the Defendant asserts that Counce cannot prove that she was treated differently than similarly situated employees outside of the protected class or that she was qualified for the position.

Counce insists that she suffered disparate treatment because younger Caucasian nurses scan their patients' wristbands when a scanner is available rather than contemporaneous to medicine administration, and are not penalized for the time lapse while she had a NPSB hearing on that issue. Although Counce supplies affidavits that confirm her behavior was the common practice for medicine administration, Counce offers no proof regarding the races of any other nurses on 2 North. (Docket Entry No. 2-4, Cody Affidavit at ¶ 3 and Docket Entry No. 2-4, Smith Affidavit at ¶ 6), As a result, there is insufficient evidence to establish that someone outside the protected class was treated more favorably than Counce and her claim of racial discrimination must fail.

Further, Counce does not compare the treatment she received from VA to that of a similarly situated male nurse, thus failing to meet her burden of establishing a case of sex discrimination.

## Age Discrimination

The Age Discrimination in Employment Act (ADEA) prohibits discharging or otherwise discriminating against any individual with respect to the terms, conditions and privileges of employment because of such individual's age and retaliation against an employee for making a

25

charge of discrimination. 29 U.S.C. §§ 623(a), (d).

To establish a prima facie case of age discrimination, the Counce must show: (1) that she was more than 40 years old (that she is a member of the protected class); (2) that she was qualified for that position; (3) that she was subject to an adverse employment action; and (4) that he was replaced by a substantially younger person. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-13 (1996); Barnett v. Department of Veterans Affairs, 153 F. 3d 338, 341 (6th Cir. 1998); 29 U.S.C.A § 621 et seq. A plaintiff can satisfy the fourth prong of the prima facie case "by showing that similarly situated non-protected employees were treated more favorably." Tuttle v. Metropolitan Government of Nashville, 474 F.3d 307 (6th Cir.2007) (citing Coomer v. Bethesda Hosp., Inc., 370 F.3d 499, 511 (6th Cir.2004)).

The only allegation of age discrimination relates to falsification of medical records where Counce asserts that she was "treated differently than other (younger Caucasian) nurses who do not administer medications on time." (Docket Entry No. 21-2, Counce Affidavit at ¶ 72). Again, while the affidavits confirm that Counce's scanning habits conformed to common procedure, she offered no proof regarding the ages of other nurses. (Docket Entry No. 2-4, Cody Affidavit at ¶ 3 and Docket Entry No. 2-4, Smith Affidavit at ¶ 6). The lack of proof regarding the ages of the other nurses on 2 North precludes a finding that Counce was treated less favorably than employees outside of the protected class and thus has failed to present a prima facie case of age discrimination under the ADEA.

### Hostile Work Environment

Title VII also prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

26

individual's race, color, religion sex or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can establish a violation of Title VII if he/she is able to prove that discrimination created a hostile work environment. Clark v. United Parcel Service, Inc., 400 F.3d 341, 347 (6th Cir.2005). Title VII is thus violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

To establish a prima facie showing of hostile work environment, Counce must demonstrate the following: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome racial or sexual harassment; (3) that the harassment was based on her race or sex; (4) that the harassment created a hostile work environment; and (5) the VA is vicariously liable. Williams v. General Motors Corp., 187 F.3d 553, 560 (6th Cir.1999); Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir.1999).

None of the remaining allegations supports a claim for a hostile work environment based on race. Counce originally claimed that her co-workers bullied her, perhaps because of her Hispanic descent. Yet, none of Counce's timely claims relate to that bullying, and her claim for hostile work environment based on race must fail.

Counce also asserts that her immediate supervisor sexually harassed her, creating a hostile work environment. (Docket Entry No. 21–1 at p. 3). Indeed, "[a]ny unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII." Williams, 187 F.3d at 565. Yet, Counce has failed to present proof that her gender was the

27

"motivating impulse" for her supervisor's behavior.  Id.  Thus, her hostile work environment

claim based on sex must fail.

## Retaliation

Under Title VII, an employer cannot retaliate against an employee who engages in any

activity protected under Title VII.  42 U.S.C. § 2000e-3(a).

Under the opposition clause of Title VII:

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees...to discriminate against any individual... because he
> has opposed any practice made an unlawful employment practice by this
> subchapter...

42 U.S.C. § 2000e-3(a).   Title VII's prohibition against retaliation extends to the employee's

opposition to any unlawful employment practice and the employee's participation in an

investigation, proceeding or hearing under Title VII.  Id.   Counce contends that VA terminated

her employment because of her complaints of bullying in the workplace.

Establishing a case of retaliation requires that the plaintiff prove: (1) that she engaged in

an activity protected by Title VII; (2) that this exercise of her protected rights was known to

defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff, or the

plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) that

there was a causal connection between the protected activity and the adverse employment action.

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir.2000).

> In short, the only qualification that is placed upon an employee's invocation of
> protection from retaliation under Title VII's opposition clause is that the manner
> of his opposition must be reasonable.  Of critical import here is the fact that there
> is no qualification on..the party to whom the complaint is made known– i.e., the
> complaint may be made by anyone and it may be made to a co-worker, newspaper
> reporter, or anyone else about alleged discrimination against oneself...the alleged

28

discriminatory acts need not be actually illegal in order for the opposition clause
to apply...

Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir.2000).

A dispute exists amongst the parties on whether Counce engaged in a protected activity prior to her EEO complaint and whether she can show the causal connection between a protected activity and her termination. Defendant contends that because Wyatt called for Counce's termination before Counce made her initial contact with the EEO counselor, she cannot claim that Defendant took adverse action against her after engaging in a protected activity.

Here, Plaintiff insists that she engaged in a protected activity when she complained to her supervisor of bullying in the workplace. (Docket Entry No. 2-1 at p. 16). For example, Counce states in an email to Wyatt dated December 9, 2002: "Carrie Cody, RN, as my Charge Nurse, told you that Diane Hiedleburg, RN was bullying me and you discounted it saying that you 'really couldn't see it.' I am of Hispanic descent, and it does not escape my observations that racism may be among the root causes of this behavior." (Docket Entry No. 21-4 at Plaintiff's Exhibit pp. 68-d-68-e).

There are several follow-up emails detailing Counce's concerns over the perceived bullying. (See Docket Entry No. 21-2, Emails From Counce to Wyatt Dated 12/23/2002 and 1/20/2003). In addition, Counce carbon-copied Dr. Harris on each email correspondence with Wyatt. See Id. Moreover, Counce stated that she believed her complaints could result in the resolution of the bullying at the "very lowest possible level." (Docket Entry No. 21-1).

Here, Counce's emails to Wyatt and Harris, opposed employment practices she thought to be unlawful. Thus, the Court concludes that Plaintiff has proof that she engaged in a protected

29

activity. The emails either refer to email responses or face-to-face meetings between herself and Wyatt, thereby satisfying the second element of her prima facie case of having notified the Defendant. The third element, that Counce's termination constituted an adverse employment action is undisputed. The only remaining inquiry is whether Counce established a causal connection between her complaints to Wyatt and her termination.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000). "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation... However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id. (citation omitted).

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." Nguyen, 229 F.3d at 566 (citing EEOC v. Avery Dennison Corp., 104 F.3d at 861). Thus, Counce must put forth sufficient evidence to create an inference that VA terminated her employment *because* she complained of bullying in the workplace and would not have done so otherwise.

The burden is minimal and the Court is required to make all reasonable inferences in favor of the nonmoving party. Plaintiff has submitted email correspondences between Wyatt and

30

Dr. Harris that express their concerns over Counce's anti-bullying campaign and Counce's

distribution of anti-bullying materials to her co-workers' mailboxes. In her email to Harris,

Wyatt stated: "[t]he tone of the 'Anti-Bullying Policy' is condescending because it was written

for school children, their parents, teachers and school officials, and they are inappropriate for this

setting. I had not approved, nor had I seen these papers before they appeared in the individual

mailboxes." (Docket Entry No. 26, Exhibit F at Email from Wyatt to Harris).

These emails also reflect that Harris and Wyatt believed Counce's anti-bullying stance

demonstrated "interpersonal issues (the lack thereof...)." (Docket Entry No. 26, Exhibit F at

Email from Harris to Wyatt). Further, in what Counce calls the "altered, back-dated" annual

proficiency report, Wyatt states:

> Ms. Counce consults the team physicians when necessary, but has not developed
> sound interpersonal skills to deal with other health care providers. For example,
> after she decided that there were bullying behaviors on 2 N, she copied an anti-
> bullying article off a "Dr. Phil" website, and put it into all the 2 N
> mailboxes...When her concerns were discussed, it was stipulated that any
> presentation was subject to prior approval by Nurse Manager. Many employees
> voiced their anger at finding this material in their mailboxes, and it was generally
> viewed as inappropriate and condescending.

(Docket Entry No. 2-3, 2003 Proficiency Report at Plaintiff's Exhibit p. 63). The report goes on

to state that Counce acted unethically and was insubordinate when she placed these materials in

her co-workers' mailboxes. Id.

A reasonable juror could infer that the disagreement between Counce and her supervisors

regarding the handling of perceived bullying in the workplace caused Counce's termination.

Thus, the Court concludes that Counce has met the requirements of a prima facie case of

retaliation under Title VII.

31

Once the Plaintiff has met her burden in establishing a prima facie case of retaliation, it is up to the Defendant to provide legitimate, non-discriminatory reasons for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Barnett v. Department of Veterans Affairs, 153 F.3d 338 (6th Cir. 1998). The Defendant insists that Counce's termination resulted from the NPSB's findings on Counce's work performance. Under McDonnell Douglas, the burden shifts back to Counce to establish that VA's stated reasons for her termination are pretext for discrimination. 411 U.S. at 804-05.

The Court concludes that Counce's proof could lead a reasonable juror to find that VA's stated reasons for Counce's termination were pretext for retaliation. In addition to the Wyatt/Harris emails demonstrating frustration with Counce's anti-bullying campaign and the comments in the 2003 Proficiency Report, sufficient evidence exists that the NPSB hearing that provided the basis for Counce's termination, was not conducted fairly. Counce's proof establishes that Smith's potentially favorable witness testimony was withheld from the NPSB hearing as well as the exclusion of Counce's union steward. (Docket Entry No. 21-2, Counce Affidavit at ¶¶ 44 and 48). Further, Counce's written account of events occurring on June 7, 2003 was not presented during the NPSB hearing while the Board heard the accounts of others. Id. at ¶ 61. Therefore, Plaintiff has presented material factual disputes on the issue of retaliation, and thus, her retaliation claim remains.

Thus, the Court concludes that Counce has failed to establish prima facie cases of race, sex , age discrimination or hostile work environment. The Court also concludes that any claims Plaintiff may have asserted under 42 U.S.C. § 1983 are not actionable as § 717 of the Civil Rights Act of 1964, is the exclusive judicial remedy for discrimination claims in federal

employment. Further, Plaintiff's claims under the Privacy Act lack merit and are untimely. The

Court, however, concludes that Plaintiff's proof establishes a <u>prima facie</u> case of retaliation.

An appropriate Order is filed herewith.

**ENTERED** this the _18th_ day of April, 2007.


WILLIAM J. HAYNES, JR.
United States District Judge

Case 3:06-cv-00171   Document 27   Filed 04/18/07   Page 33 of 33 PageID #: 825